**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HAROLD L. RODARMER, | ) | CASE NO. 1:17CV00474 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Harold L. Rodarmer ("Plaintiff" or "Rodarmer"), challenges the final decision

of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq.* ("Act"). This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation. For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

In October 2013, Rodarmer filed applications for POD and DIB, alleging a disability onset date of July 23, 2012 (later amended to October 14, 2013), and claiming he was disabled due to ankylosing spondylitis, bilateral sacroiliitis, phlebitis, arthritis, and depression. (Transcript ("Tr.") 40, 180, 200.)  The applications were denied initially and upon reconsideration, and Rodarmer requested a hearing before an administrative law judge ("ALJ"). (Tr. 133, 142, 149.)

On October 28, 2015, an ALJ held a hearing, during which Rodarmer, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 30.)  On December 7, 2015, the ALJ issued a written decision finding Rodarmer was not disabled.  (Tr. 12-25.)  The ALJ's decision became final on January 11, 2017, when the Appeals Council declined further review. (Tr. 1.)

On March 7, 2017, Rodarmer filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12 & 13.) Rodarmer asserts the following assignments of error:

> (1)  The ALJ erred when he failed to account for Rodarmer's need for a cane in the RFC.

> (2) The ALJ did not properly weigh the opinion of Dr. Ignat, a treating physician.

(Doc. No. 12.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Rodarmer was born in December 1966 and was 47 years-old at the time of his administrative hearing, making him a "younger" person under social security regulations.  (Tr.

Tr. 23.)  *See* 20 C.F.R. §§ 404.1563(c).  He has a limited education and is able to communicate in English.  (Tr. 23)  He has past relevant work as a maintenance worker, assistant property manager, and an inside sales and ordering worker.  (*Id.*)

**B.     Medical Evidence**

As Rodarmer's grounds for relief relate solely to his physical impairments, the Court's recitation of the medical evidence will be limited to those impairments, with a particular emphasis on Rodarmer's use of a cane and his treatment with Dr. Ignat.[2]

On April 25, 2011, Rodarmer underwent a consultative examination with Robert A. Blaine, M.D., in connection with a prior application for disability.[3]  (Tr. 256.)  During this examination, he did not use an assistive device to ambulate.  (Tr. 257.)  Rodarmer had a slightly decreased range of motion in his cervical spine and shoulders, and complained of back pain when he elevated his arms.  (*Id.*)  He had a full range of motion in his elbows, wrists, knees, and ankles, but decreased range of motion in his hips and thoracolumbar spine.  (*Id.*)  Straight leg raises produced back pain.  (Tr. 258.)  Rodarmer's grip strength was full, and he had full strength in his upper and lower extremities.  (*Id.*)  He had a normal gait, station, and heel and toe walk. (*Id.*)  He was able to squat halfway to the floor without assistance.  (*Id.*)

Following this examination, Dr. Blaine filled out a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)."  He made the following findings regarding

---

[2]      The Court notes its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]      The Court further notes Rodarmer is alleging an October 14, 2013 onset date of disability.  However, as Rodarmer has cited to Dr. Blaine's opinion in his brief, the Court will include this evaluation in the discussion of the medical evidence.

Rodarmer:

- He could occasionally lift and carry up to 20 pounds.

- He could sit, stand, and walk for 30 minutes at one time. He could sit for 8 hours total in an 8-hour workday, stand for one hour in an 8-hour workday, and walk for one hour in an 8-hour workday.

- He did not require the use of a cane to ambulate.

- He could occasionally reach, including overhead. He could occasionally handle, finger, feel, push, and pull.

- He could occasionally work at unprotected heights, near moving mechanical parts, operate a motor vehicle, and work in humidity, wetness, extreme cold, and extreme heat. He could frequently work near dusts, odors, fumes, pulmonary irritants, and vibrations.

- He could not walk a block at a reasonable pace on rough or uneven surfaces, but he could ambulate without using a wheelchair, walker, or two canes or crutches.

(Tr. 259-264.)

On February 12, 2013, Rodarmer first visited Allied Health & Chiropractic, a chiropractor practice with Ty Dahodwala, D.C. and James Alberty, D.C. (Tr. 349, 350, 361.) He reported neck pain and stiffness. (*Id.*) On examination, he had a normal gait. (Tr. 361) Rodarmer then visited this practice on four more occasions in 2013[4]. (Tr. 360). During his last visit of record, on March 5, 2013, he indicated his neck was improving overall, but it still felt tight and achey. (*Id.*)

On February 28, 2013, Rodarmer began to treat with Gheorghe Ignat, M.D., a rheumatologist. (Tr. 307.) Rodarmer indicated he had ankylosing spondylitis for the past 20

---

[4]    The Court notes the signatures on the treatment pages are not legible, so it is unclear if he received treatment from Dr. Dahodwala or Dr. Alberty during these visits.

years.  (*Id.*)  He reported lower back and neck pain, along with stiffness and pain in his hips.

(*Id.*)  On examination, Rodarmer's hips were tender, with a decreased range of motion.  (*Id.*)  His

shoulders exhibited crepitus with a normal range of motion.  (*Id.*)  His cervical spine was tender,

with a normal range of motion, while his lumbar spine had a decreased range of motion.  (*Id.*)

Rodarmer had tenderness in his sacroiliac joint, but his muscle strength was normal.  (*Id.*)  Dr.

Ignat renewed Rodarmer's prescriptions for Prednisone, Meloxicam, and Hydrocodone.  (*Id.*)

Rodarmer returned to Dr. Ignat's office on March 26, 2013.  He reported his medications

were helping "partially."  (Tr. 306.)  Dr. Ignat then sought insurance approval for Simponi, a

different medication.  (*Id.*)  Rodarmer began to take Simponi for his symptoms.  (Tr. 305.)  He

followed up with Dr. Ignat on August 22, 2013.  He indicated "in general he has improved since

starting Simponi" but he was having some swelling in his right elbow.  (*Id.*)  Dr. Ignat prescribed

steroids for his right elbow symptoms and renewed the Simponi and Meloxicam.  (*Id.*)

On September 10, 2013, Rodarmer first saw Jeffrey Owen Galvin, M.D., a primary care

physician.  (Tr. 310.)  His complaints were mild generalized fatigue, memory loss, and right-

sided olecranon bursitis.  (*Id.*)  He reported daily pain from his ankylosing spondylitis, and

requested his cholesterol levels be checked.  (*Id.*)  On examination, Rodarmer had a mild amount

of soft tissue swelling over the right elbow.  (Tr. 312.)  Dr. Galvin ordered labwork and provided

Rodarmer with an ace bandage for his elbow.  (Tr. 313.)

Rodarmer returned to Dr. Ignat on October 23, 2013.  He was still having pain along his

entire spine, and he indicated his Meloxicam did not always help.  (Tr. 304.)  On examination, he

was tender in the SI joints, with a decreased range of motion in his lumbar spine.  (*Id.*)  His

muscle strength was normal.  (*Id.*)  Dr. Ignat assessed Rodarmer as having "ankylosing

spondylitis, mainly spine involvement, still active, improved on Simponi." (*Id.*)

On January 22, 2014, Rodarmer reported decreased pain to Dr. Ignat, but Dr. Ignat noted he "still has pain in his whole spine, peripheral joints, intermittently." (Tr. 303.) On examination, his hips and lumbar spine were tender with a decreased range of motion. (*Id.*) His shoulders were tender with a normal range of motion. (*Id.*) His sacroiliac joints were tender, but he had normal muscle strength. (*Id.*) Dr. Ignat renewed Rodarmer's Simponi prescription, and prescribed Prednisone. (*Id.*)

Rodarmer returned to Dr. Galvin on February 4, 2014. He indicated he recently had been experiencing dyspnea with exertion. (Tr. 325.) He also reported worsening pain in his back and rib cage for the past six months. (*Id.*) He relayed this pain intensified the weekend prior, and he contemplated visiting the emergency room. However, the pain then subsided spontaneously. (*Id.*) Rodarmer appeared normal on physical examination. (Tr. 327.) Dr. Galvin indicated Rodarmer likely had a gallstone attack. (*Id.*)

On February 28, 2014, Rodarmer had a consultation with rheumatologist Qingping Yao, M.D., for his shortness of breath. (Tr. 333.) He indicated 20% improvement of his ankylosing spondylitis symptoms with Simponi. (*Id.*) He reported he was able to perform normal, basic daily activities without limitation. (*Id.*) Rodarmer did not have an unsteady gait and was not using a cane. (Tr. 334.) He had no swelling in his joints, but his chest expansion was limited. (*Id.*)

Dr. Yao indicated Rodarmer's shortness of breath was likely due to his limited chest expansion, and ordered diagnostic testing. (*Id.*) Pulmonary function testing was normal, and a chest x-ray was negative for acute cardiopulmonary process. (Tr. 341, 346.) An x-ray of

Rodarmer's sacroiliac joints revealed sclerosis, with probable mild ankylosis on the right side. (Tr. 337.)

On July 15, 2014, Rodarmer visited John Krebs, M.D., an orthopedist, for bilateral hand pain and numbness. (Tr. 421.) He reported his hand symptoms had been present for "quite sometime," but had worsened after using a sander in May 2014. (*Id*.) Dr. Krebs noted a past EMG did confirm bilateral carpal tunnel syndrome. (*Id.*) Rodarmer had positive Tinel's and Phalen's signs bilaterally. (*Id.*) Rodarmer then underwent a right carpal tunnel release on August 20, 2014 and a left carpal tunnel release on November 12, 2014. (Tr. 424, 426.)

Rodarmer returned to Dr. Ignat on August 22, 2014. Dr. Ignat renewed the Simponi prescription, and Rodarmer indicated he had decreased pain. (Tr. 381.) However, on October 20, 2014, Rodarmer reported severe pain in his lumbar spine, which was radiating into his buttocks. (Tr. 380.) On examination, Rodarmer had normal muscle strength, but decreased range of motion in his hips and lumbar spine, with tenderness in his spine and sacroiliac joints. (*Id*.) Dr. Ignat administered a Toradol injection and renewed Rodarmer's medications. (*Id*.)

That same day, Dr. Ignat filled out a form entitled "Physical Residual Function Capacity Medical Source Statement." (Tr. 410.) While he reported treating Rodarmer since January 2013, he also indicated Rodarmer's "impairments, symptoms, and limitations" had been present since 2011. (*Id.*) Dr. Ignat provided the following limitations for Rodarmer:

- He could occasionally lift up to 15 pounds, but never lift 20 pounds or more.

- He could walk one city block or more without rest or pain, but could not walk one block or more on rough or uneven ground.

- He could not climb steps without the use of a handrail at a reasonable pace, and he had problems with balance while ambulating.

- He had problems with stooping, crouching, and bending.

- He would need to lie down/recline for 30 minutes before needing to sit up, stand up, or walk around. He would need to lie down/recline for about 3 hours out of an 8-hour workday.

- He could sit for less than one hour in an 8-hour workday. He could stand and walk for less than one hour in an 8-hour workday.

- He would need to take unscheduled breaks every 30-60 minutes. During these breaks, he would need to lie down or sit quietly, and rest for 30 minutes before returning to work.

- He would not need to elevate his legs with prolonged sitting. He would need an assistive device with prolonged ambulation.

- He could use his hands 100% of the day for grasping, turning, and twisting objects. He could perform fine manipulation for 80% of the workday, and reach, including overhead, for 50% of the workday.

- He could not push and pull arm or leg controls from a sitting position for 6 or more hours during an 8-hour workday.

- He could not climb stairs, ladders, scaffolds, ropes, or ramps.

- His pain would frequently interfere with his attention and concentration. His "experience of stress" would occasionally interfere with his attention and concentration.

- He would be off-task more than 30% of the workday, be absent from work more than 5 days a month, and 5 days a month he would be unable to complete an 8-hour workday.

- Compared to an average worker, he could efficiently perform a job on a sustained basis 50% or less of the time.

- He is "unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week for a continuous period of six months or more.

(Tr. 410 -413.)

Rodarmer returned to Dr. Ignat's office on January 15, 2015. Dr. Ignat prescribed a course of steroids because Rodarmer reported increased pain. (Tr. 379.)

8

On January 20, 2015, Rodarmer returned to his chiropractor[5] for cervical spine pain. (Tr. 358.) Rodarmer attributed it to an awkward sleeping position. (*Id*.) The chiropractor performed spinal and tissue manipulation to the cervical area. (*Id*.) Rodarmer returned to his chiropractor on January 23, 2015, reporting improvement with treatment. (Tr. 357.) On examination, he exhibited mild spasms with palpitation. (*Id*.)

On January 26, 2015, Rodarmer visited Dr. Ignat. He reported increased pain in his spine and shoulders, along with chest tightness. (Tr. 378.) He also indicated improvement since his last visit, with "only mild" lumbar spine pain radiating into the buttocks. (*Id*.) Dr. Ignat continued to prescribe Simponi. (*Id*.)

Rodarmer visited his chiropractor six more times over January and February 2015. (Tr. 351-356.) He reported continued cervical spine pain, attributing it to various activities, including using a snow plow, illness, and painting. (Tr. 355, 354, 353.) On March 3, 2015, Rodarmer's cervical spine was "mildly sore." (Tr. 352.) His chiropractor noted Rodarmer had "improvements with cane." (*Id*.)

On March 12, 2015, Rodarmer established with Munketh Salem, DPM, a podiatrist. (Tr. 368.) He reported pain in the ball of his right foot, after slipping on a flight of stairs. (*Id*.) Rodarmer indicated this pain increased with ambulation, and rated the pain as 5/10. (*Id*.) On examination, the muscle strength in his foot and ankle was 5/5. (Tr. 369.) Rodarmer was unable to dorsiflex the ankle beyond a neutral position with his knee extended. (*Id*.) Dr. Salem noted no edema, but there was pain with palpation to the right foot. (*Id*.) An x-ray of Rodarmer's right

---

[5] The Court again notes the signatures on the treatment pages are not legible, therefore it is not clear if he received treatment from Dr. Dahodwala or Dr. Alberty during these visits.

foot revealed no acute pathology or fracture, but he did have moderate degenerative joint disease throughout the foot. (*Id.*) Dr. Salem noted Rodarmer's "current pain is very minimal" and due to a hammertoe deformity and capsulitis in the joints at the ball of the foot. (Tr. 370.) Dr. Salem prescribed Rodarmer a course of steroids. (*Id.*)

Rodarmer returned to Dr. Salem on April 22, 2015. (Tr. 364.) He had continued pain in his right foot, which was intermittent in nature. (*Id.*) Dr. Salem taped and splinted Rodarmer's toes, prescribed steroids, and recommended custom orthotics. (Tr. 366.)

Rodarmer visited Dr. Ignat on April 20, 2015. Dr. Ignat noted Rodarmer's condition was "still active, not controlled on medications." (Tr. 376.) On examination, Rodarmer's hips were tender with decreased range of motion and his shoulders exhibited crepitus, but with a normal range of motion. (*Id.*) His cervical spine range of motion was normal, but his lumbar range of motion was decreased. (*Id.*) He had severe tenderness in his sacroiliac joints, and his muscle strength was normal. (*Id.*) Dr. Ignat then suggested Rodarmer try a different medication, Otezla. (*Id.*)

Rodarmer began to take Otezla and had improvement in his symptoms. (Tr. 375.) On July 27, 2015, Rodarmer's condition was "in general controlled now since he started Otezla." (*Id.*) His hips and shoulders were still tender, and his sacroiliac joints exhibited severe tenderness. (*Id.*) On August 17, 2015, Dr. Ignat noted "overall his condition is still mildly active, better controlled now on medication." (Tr. 374.)

On August 28, 2015, Rodarmer returned to Dr. Ignat's office with a flare of right sacroiliac joint and right hip pain. (Tr. 372.) Bilateral hip x-rays revealed maintained sacroiliac and hip joints, with mild sclerosis of both sacroiliac joints. (Tr. 386.) On Rodarmer's left hip,

there was a "subcondral cystic change with sclerotic rim about the left femoral neck."  (*Id.*)

Rodarmer visited Dr. Ignat on October 5, 2015, reporting a flare of right shoulder pain. (Tr. 415.)  He indicated his back and right sacroiliac joint pain had improved.  (*Id.*)  Dr. Ignat assessed Rodarmer as having a right shoulder arthritis flare, and administered a glucocorticoid injection into the right shoulder.  (*Id.*)

## C.      State Agency Reports

On December 4, 2013, state agency physician Esberdado Villanueva, M.D., reviewed Rodarmer's records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  Dr. Villanueva determined Rodarmer could perform a range of medium work[6], with no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, and frequent balancing, stooping, kneeling, crouching, and crawling.  (Tr. 113.)  Dr. Villanueva explained this opinion was an adoption of the RFC assessed by the previous ALJ in a July 10, 2012 decision.  (Tr. 113, 94.)

On June 9, 2014, state agency physician Michael Delphia, M.D., reviewed Rodarmer's records and completed a Physical RFC Assessment.  (Tr. 128.)  Dr. Delphia also adopted the RFC assessed by the previous ALJ in the July 10, 2012 decision.  (*Id.*)

---

[6]      "Medium work" is defined as follows: "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine he or she can also do sedentary and light work." 20 CFR § 404.1567(c). Social Security Ruling 83–10 clarifies that "a full range of medium work requires standing and walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting and carrying objects weighing up to 25 pounds." SSR 83–10, 1983 WL 31251 (1983).

**D. Hearing Testimony**

During the October 28, 2014 hearing, Rodarmer testified to the following:

- He had a left hand carpal tunnel release in April 2014, and a right hand carpal tunnel release in November 2014. His hands are now doing "pretty good," and while not completely improved, are "much better than what they were." (Tr. 43.) His hands are still very sore. (Tr. 64.) He sometimes has difficulty carrying a plate of food. (*Id.*) It is difficult for him to hold a razor. (Tr. 65.)

- He drives four times a week. (Tr. 45.) He drives to the grocery store or Lowe's. (*Id.*) He goes to Lowe's to walk and "stay mobile." (*Id.*) He grocery shops, but needs help lifting the heavier items. (Tr. 57.) He does most of the cooking in his household. (*Id.*) He does light housework, such as loading the dishwasher, doing the laundry, and dusting. (Tr. 60.) He can mow his backyard, but he cannot dig, shovel, or rake. (*Id.*)

- He went through the ninth grade in school. (Tr. 46.) He never obtained a GED. (*Id.*) He knows how to read and write. (*Id.*)

- He cannot work because of "lack of sleep" and an inability to stand or sit for very long. (Tr. 47.) He finds it difficult to sit longer than 30 minutes. (*Id.*) He will need to get up and stretch or lie down due to stiffness. (*Id.*)

- He has a cane, but he does not need it all the time. (Tr. 59.) He needs it when he is standing for a long time or is out in public on a "bad day." (*Id.*) It is prescribed. (*Id.*) He can stand with a cane for 20 minutes. (*Id.*) Without a cane, he can stand anywhere from a few minutes to 10-15 minutes, depending upon his pain level that day. (*Id.*)

- He can walk a block. (*Id.*) He can lift 5-15 pounds. (*Id.*) His pain is primarily along his spine, from his neck to lower back. (Tr. 63.) He rocks back and forth throughout the day, in order to shift his weight from his lower back or hips. (*Id.*)

- His arthritis has "good days" and "bad days." (Tr. 48.) During the course of the week, he will have about four bad days. (*Id.*) During a bad day, he will get up three times during the night and take longer to shave and shower. (*Id.*) He does not walk his dog on bad days. (Tr. 62.) He has pain and stiffness every day, but it is much worse on his bad days. (Tr. 49.)

- He takes medications daily, and received steroid injections three times this past year (Tr. 50.) He does not take medications for depression or anxiety. (Tr. 51.)

- He gets along with other people, but he tends to stay home with his spouse. (Tr.

52.)  He traveled to Florida last year by plane.  (*Id.*)  He indicated the flight was 2.5 - 3 hours, and he stood up half a dozen times during the flight.  (Tr. 53.)  His medication also helped "[take] away the edge" and allowed him to sit for longer periods.  (Tr. 54.)  The steroids he was on at the time made his pain more tolerable, and allowed him to ride a boat during his vacation.  (Tr. 55.)

• His feet always ache.  (Tr. 66.)  The pain in his feet will wake him up at night. (Tr. 67.)

The ALJ asked the VE to assume Rodarmer had past work as an assistant property manager, maintenance worker, and an inside sales and ordering worker.  (Tr. 70.)  The ALJ then posed the following hypothetical question:

Assume a hypothetical individual the claimant's age and education.  Further assume that the hypothetical individual is limited to medium[7] with the manipulative limitations.  Frequent left and right fingering.  The postural limitations.  Occasionally climbing of ramps and stairs.  Never to climb ladders and scaffolds.  Occasional balance, stoop, kneel, crouch, and crawl. The environmental limitations.  Never to be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle.

(Tr. 75-76.)

The ALJ then added an additional limitation to this hypothetical, limiting the individual to the light[8] exertional level.  (Tr. 77.)

---

[7]  As noted *supra,* "Medium work" is defined as follows: "medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine he or she can also do sedentary and light work." 20 CFR § 404.1567(c). Social Security Ruling 83–10 clarifies that "a full range of medium work requires standing and walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting and carrying objects weighing up to 25 pounds." SSR 83–10, 1983 WL 31251 (1983).

[8]  "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting

The VE testified the hypothetical individual[9] would also be able to perform other representative jobs in the economy, such as packager (D.O.T. #559.687-074), a bench assembler (D.O.T. #706.684-022), and a mail clerk (D.O.T. #209.687-026).  (*Id.*)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in

---

most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

[9]     The Court notes the VE did not specifically testify as to whether or not Rodarmer could perform his past work.  (*See* Tr. 77.)

"substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Rodarmer was insured on his alleged amended disability onset date, October 14, 2013, and remained insured through June 30, 2014, his date last insured ("DLI.")  (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Rodarmer must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2014.

2.    The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of October 14, 2013 through his date last insured of June 30, 2014 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: sacroiliitis with a history of ankylosing spondylitis, lumbar degenerative disc disease, and bilateral carpal tunnel syndrome (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds.  He can sit six hours out of an eight-hour workday, and stand and walk six hours out of an eight-hour workday.  He can push and pull without limitation other than that shown for lift and/or carry.  In addition, the claimant can frequently handle and finger with his right and left upper extremities.  He can occasionally climb ramps and stairs, never climb ladders and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.  The claimant must also avoid exposure to hazards, such as unprotected heights, moving mechanical parts, and operating a motor vehicle.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on December **, 1966 and was 47 years old, which is defined as a young individual age 18-49, on the date last insured (20 CFR 404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act since October 14, 2013, the amended alleged onset date, through June 30, 2014, the date last insured (20 CFR 404.1520(f)).

(Tr. 12-24.)


## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*,

889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If

relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: Cane Limitation in RFC**

In his first assignment of error, Rodarmer argues the ALJ erred in failing to account for

a cane in the residual functional capacity.[10]  (Doc. No. 12 at 1.)  He asserts the RFC formulated

by the ALJ is "not tenable with someone with a documented need for an assistive device."  (*Id.*

at 8.)  Rodarmer notes the ALJ attempted to dismiss this use of a cane by "noting that 'he has not

required any use of any assistive device for pain and movement in his wrists and hands.'"  (*Id.*)

He maintains, however, that "[i]t was certainly not a proper evaluation to fail to include an

assistive device in the RFC simply because he does not need one for his hands."  (*Id.*)

The Commissioner argues the ALJ properly excluded the use of a cane in the RFC.

(Doc. No. 13 at 8.)  She cites to Social Security Ruling 96-9p, noting there must be medical

---

[10]      Rodarmer also somewhat confusingly cites to Listing 1.00J, arguing it is a
"directive to consider the impact of the need for an assistive device on the
availability of the use of one of both upper extremities."  (Doc. No. 12 at 8.)
Contrary to Rodarmer's argument, Listing 1.00J is not a general directive
mandating an ALJ to consider the impact of an assistive device.  Rather, Listing
1.00J provides guidance as to how a physical examination should be conducted
for individuals with hand-held assistive devices.  *See* 20 C.F.R. Pt. 404, Subpt. P,
App. 1, §1.00(J)(1), (4).  Accordingly, the Court finds this portion of the
argument to be without merit.

documentation of a need for an assistive device.  (*Id*.)  She asserts Rodarmer does not cite to any medical evidence which establishes a medical need for a cane.  (*Id.*)  She also argues Rodarmer denied the use of a cane at several points in the record, and engaged in activities such as snowplowing.  (*Id*. at 8, 9.)  The Commissioner maintains Dr. Ignat's opinion, which found Rodarmer required a cane, does not "establish a medical need for a cane" because the treatment notes did not provide for a prescription or need for an assistive device.  (*Id*. at 9.)

Lastly, the Commissioner argues Rodarmer has misconstrued the ALJ's discussion of the use of an assistive device.  (*Id*. at 10.)  She asserts the ALJ properly acknowledged Rodarmer's testimony regarding the intermittent use of a cane in the context of his ankylosing spondylitis, and then properly noted Rodarmer does not use any assistive devices for his bilateral carpal tunnel syndrome.  (*Id*. at 11.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer v. Astrue*, 774

20

F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Rodarmer suffered from the severe impairments of sacroiliitis with a history of ankylosing spondylitis, lumbar degenerative disc disease, and bilateral carpal tunnel syndrome. (Tr. 15.) After determining Rodarmer's impairments did not meet or equal a Listing, the ALJ went on to step four to consider the medical evidence regarding Rodarmer's impairments. (Tr. 16-22.) In particular, the ALJ discussed, in detail, the contents of Dr. Ignat's treatment notes and the objective findings upon examination. (Tr. 18.) The ALJ also provided a discussion of Rodarmer's chiropractic treatment and his visit with Dr. Yao. (Tr. 19-20).

The ALJ then discussed Rodarmer's daily activities. Of particular relevance, the ALJ noted Rodarmer "testified he uses a cane when needed, for example, if he is 'out and about' or standing for a long time, but does not use it on a daily basis." (Tr. 20.) The ALJ acknowledged "while the claimant does use a cane as needed, he has not required use of any assistive device for

pain and movement in his wrists and hands." (*Id.*)

The ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds. He can sit six hours out of an eight-hour workday, and stand and walk six hours out of an eight-hour workday. He can push and pull without limitation other than that shown for lift and/or carry. In addition, the claimant can frequently handle and finger with the right and left upper extremities. He can occasionally climb ramps and stairs, never climb ladders and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. The claimant must also avoid exposure to hazards, such as unprotected heights, moving mechanical parts, and operating a motor vehicle.

(Tr. 17.)

The Court finds the RFC is supported by substantial evidence. The ALJ specifically acknowledged Rodarmer's testimony regarding his intermittent use of a cane. (Tr. 20.) The ALJ provided a detailed and accurate reflection of this testimony, noting Rodarmer used a cane "when needed, for example, if he is 'out and about' or standing for a long time, but does not use it on a daily basis." (*Id.*) The ALJ also correctly summarized Dr. Ignat's treatment notes, acknowledging Rodarmer's reports of pain and limitation of motion, but also noting normal muscle strength and no joint swelling. (Tr. 18.) Later in the decision, the ALJ again acknowledged Rodarmer used a cane "as needed." (Tr. 20.)

Substantial evidence supports the ALJ's conclusion. A review of the record reveals little documentation for the use of a cane. As noted *supra,* Rodarmer treated with Dr. Ignat, a rheumatologist, throughout the relevant period for his ankylosing spondylitis. (Tr. 381, 307, 306, 305, 304, 303.) A careful review of these treatment notes do not indicate any regular cane use.

22

(*Id.*)  In fact, at no point in Dr. Ignat's treatment notes is there any notation regarding an abnormality in Rodarmer's gait or need for an assistive device.  (*Id.*)

Further, during Rodarmer's February 2014 consultation with Dr. Yao, Dr. Yao specifically noted Rodarmer did not have an unsteady gait or use a cane.  (Tr. 334.)  The only documentation of a cane in the medical record was during a March 3, 2015 chiropractic visit,[11] where the chiropractor noted Rodarmer had "improvements with cane."  (Tr. 352.)

Rodarmer's own subjective reports also do not support a finding his RFC required a limitation for a cane.  When Rodarmer initially applied for benefits in October 2013, he filled out a "Function Report - Adult," in which he specifically denied the use of a cane.  (Tr. 221, 227.)  Most tellingly, Rodarmer testified at the hearing he did not use a cane on a daily basis.  (Tr. 59.)  He indicated he would use a cane if he stood for extended periods or was having a "bad day."  (*Id.*)

Moreover, Rodarmer does not direct this Court's attention to any particular medical evidence from the relevant time period which supports the use of a cane.  (Doc. No. 12 at 8.)  Rodarmer does cite to the October 20, 2014 medical opinion of Dr. Ignat, which provided Rodarmer would require an assistive device to ambulate.  (*Id*. at 7.)  However, this limitation provided by Dr. Ignat is not only inconsistent with his own treatment notes, but the self-report of Rodarmer as well.  (Tr. 59, 227, 330, 304, 305, 306, 307.)

Rodarmer asserts the ALJ "summarily tries to dismiss [the use of a cane] by also noting

_____

[11]    The Court notes this treatment note occurred after Rodarmer's June 30, 2014 DLI.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (noting that evidence of a medical condition diagnosed after the date last insured was only "minimally probative" of the claimant's condition during the insured period).

that 'he has not required use of any assistive device for pain and movement in his wrists and hands.'" (Doc. No. 12 at 8.)  Rodarmer essentially argues the ALJ did not include an assistive device in the RFC "because he does not need one for his hands." (*Id.*)  The Court finds this argument without merit.

Relevant to here, the ALJ noted the following in the body of the decision:

> The claimant also testified that he uses a cane when needed, for example, if he is "out and about" or standing for a long time, but does not use it on a daily basis (Hearing Record, 10/28/15).

(Tr. 20.)  The ALJ then, several paragraphs down, notes:

> The medical evidence shows treatment for ankylosing spondylitis and carpal tunnel syndrome that has stabilized and is controlled with medication.  In addition, while the claimant does use a cane as needed, he has not required use of any assistive device for pain and movement in his wrists or hands. The record demonstrates that surgery to treat the claimant's carpal tunnel syndrome rectified his condition in his right hand and the treating physician recommended the same procedure to address carpal tunnel syndrome in the claimant's left hand.

(Tr. 20-21.)

Rodarmer is incorrect in his characterization of the ALJ's discussion in the decision. Rodarmer asserts the ALJ did not include an assistive device limitation in the RFC because he does not need one for his hands.  (Doc. No. 12 at 8.)  However, a careful review of the decision indicates the ALJ did consider Rodarmer's intermittent cane use in the decision.  The paragraph cited by Rodarmer relates discussion to his carpal tunnel; however, it is clear the ALJ discussed Rodarmer's cane use in the context of his analysis earlier in the decision.  (Tr. 20.)

Accordingly, the Court finds Rodarmer has failed to demonstrate the ALJ erred in failing to include in the RFC a limitation for a cane.  Rodarmer's first assignment of error is without merit.

**B.        Second Assignment of Error: Treating physician Dr. Ignat**

In his second assignment of error, Rodarmer argues the ALJ failed to articulate "good reasons" for rejecting the opinion of treating physician Dr. Ignat.  (Doc. No. 12 at 9, 10.)  He asserts the ALJ did not cite to any contrary medical opinions or evidence upon which he relied when rejecting the opinion.  (*Id*. at 9.)  Rodarmer argues the ALJ "did nothing more than ambiguously [reference] cherry-picked pieces of Dr. Ignat's records," and gave no consideration to the nature of the treatment relationship or the fact Dr. Ignat was a specialist.  (*Id*. at 9, 10.)  He further notes Dr. Ignat's opinion is "remarkably consistent" with the opinion of consultative examiner, Dr. Blaine.  (*Id*. at 11.)  Rodarmer concludes "no meaningful review of the reasoning is possible" as it "is simply a conclusion without an articulable basis."  (*Id*.)

The Commissioner argues the ALJ provided a comprehensive analysis of the record, and properly weighed Dr. Ignat's opinion.  (Doc. No. 13 at 13, 14.)  She maintains substantial evidence supports the ALJ's conclusion, particularly Dr. Ignat's progress notes and Rodarmer's reported activities.  (*Id*. at 14.)  The Commissioner asserts the consultative examiner opinion referenced by Rodarmer in his brief is from 2011, in connection with a previous application and ALJ decision.  (*Id*. at 15.)  She argues the "ALJ was not required to analyze the examiner's opinion from the prior ALJ's decision and/or compare it to Dr. Ignat's" opinion.  (*Id*.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in

the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at

544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As noted *supra*, Dr. Ignat, Rodarmer's rheumatologist, submitted a medical opinion in

October 2014.[12]  Dr. Ignat provided the following limitations for Rodarmer:

- He could occasionally lift up to 15 pounds, but never lift 20 pounds or more.

- He could walk one city block or more without rest or pain, but could not walk one block or more on rough or uneven ground.

- He could not climb steps without the use of a handrail at a reasonable pace, and he had problems with balance while ambulating.

- He had problems with stooping, crouching, and bending.

- He would need to lie down/recline for 30 minutes before needing to sit up, stand up, or walk around.  He would need to lie down/recline for about 3 hours out of an 8-hour workday.

- He could sit for less than one hour in an 8-hour workday.  He could stand and walk for less than one hour in an 8-hour workday.

- He would need to take unscheduled breaks every 30-60 minutes.  During these breaks, he would need to lie down or sit quietly, and rest for 30 minutes before returning to work.

- He would not need to elevate his legs with prolonged sitting.  He would need an assistive device with prolonged ambulation.

- He could use his hands 100% of the day for grasping, turning, and twisting objects.  He could perform fine manipulation for 80% of the workday, and reach, including overhead, for 50% of the workday.

---

[12]  The Court notes Dr. Ignat's October 20, 2014 opinion was rendered several months after Rodarmer's June 30, 2014 date last insured.  The Sixth Circuit has explained that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin*., 88 Fed. App'x 841, 845 (6th Cir. 2004).  *See also Kingery v. Comm'r of Soc. Sec.,* 142 F. Supp.3d 598, 602 (S.D. Ohio 2015); *Barhouma v. Astrue*, 2010 WL 2044952 at * 8 (N.D. Ohio May 24, 2010.)  "A treating physician's opinion rendered after the DLI 'may be considered to the extent it illuminates [Plaintiff's] health before the expiration of [her] insured status.'" *Stark v. Comm'r of Soc. Sec.*, 2016 WL 1077100 at * 6 (N.D. Ohio March 18, 2016) (quoting *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (6th Cir. 1999)).  Since neither party has raised this issue, the Court will not address it further.

- He could not push and pull arm or leg controls from a sitting position for 6 or more hours during an 8-hour workday.

- He could not climb stairs, ladders, scaffolds, ropes, or ramps.

- His pain would frequently interfere with his attention and concentration. His "experience of stress" would occasionally interfere with his attention and concentration.

- He would be off-task more than 30% of the workday, be absent from work more than 5 days a month, and 5 days a month he would be unable to complete an 8-hour workday.

- Compared to an average worker, he could efficiently perform a job on a sustained basis 50% or less of the time.

- He is "unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week for a continuous period of six months or more.

(Tr. 410 -413.)

At step four of the sequential evaluation, the ALJ weighed Dr. Ignat's opinion as follows:

> As for the opinion evidence, the undersigned considered the opinion of Dr. Gheorghe Ignat who completed a Physical Residual Functional Capacity Medical Source Statement on October 20, 2014 (Ex. B12F). Dr. Ignat noted that he had been seeing the claimant every three months since February 2013 to treat his ankylosing spondylitis. Dr. Ignat completed an assessment of the claimant's ability to perform functions in a competitive work environment and concluded that the claimant could occasionally lift 15 pounds or less but never 20 pounds or more, and could occasionally carry five pounds or less, rarely 10 to 15 pounds, and never 20 pounds or more. Furthermore, Dr. Ignat opined that the claimant could walk one city block or more without rest or severe pain but does have limitations with balance, stooping, crouching, and bending, climbing steps, and walking on even ground. Dr. Ignat further opined that the claimant would need to lay down and/or recline about three hours and stand and walk less than one hour in an eight-hour workday. He estimated that the claimant would be "off task" more than 30% of an eight-hour workday, would be absent five days or more per month, and would perform at 50% or less efficiency rate. The regulations direct that well-supported treating physician opinions that are consistent with other substantial evidence of record must receive

29

controlling weight (20 CFR 404.1527(d)(2) and SSR 96-2p). The undersigned accords little weight to Dr. Ignat's opinion rather than controlling weight because clinical and diagnostic findings do not substantiate this level of limitation. In progress notes from February 2013 through October 2015, on physical examination, Dr. Ignat observed the claimant to be pleasant, comfortable, and in no acute distress (Ex. B10F). He presented with joint pain, back pain, stiffness and some decrease range of motion; however, Dr. Ignat consistently found no joint swelling and normal muscle strength. Dr. Ignat also noted that the claimant's pain and alleged symptoms were, in general, controlled and even improved with medication (Ex. B10F, B13F).

(Tr. 21.)

As an initial matter, the Court notes the RFC adopted (or was not inconsistent with) several of the functional limitations assessed by Dr. Ignat in his October 2014 opinion. Specifically, the ALJ found Rodarmer would not need to elevate his legs during the workday, could frequently handle and finger objects bilaterally, and could not climb ladders, ropes, or scaffolds. (Tr. 17.) These specific limitations are consistent with Dr. Ignat's opinion. (*See* Tr. 410 - 413.) As such, the Court will not address these particular limitations in its evaluation of the weighing of Dr. Ignat's opinion.

The RFC conflicts, however, with the remainder of Dr. Ignat's opinion. For the following reasons, the Court finds the ALJ properly evaluated this opinion. The ALJ correctly noted Dr. Ignat was a treating source. (Tr. 21.) He declined to assign this opinion controlling weight, and afforded it "little weight," explaining "clinical and diagnostic findings do not substantiate this level of limitation." (*Id*.) The ALJ then provided a brief review of portions of Dr. Ignat's treatment notes, in which Rodarmer was comfortable, not in acute distress, and had full muscle strength. (*Id*.) The ALJ also noted Rodarmer had complaints of pain, stiffness, and decreased range of motion, but improvement with medications. (*Id.*)

The Court agrees that, taken alone, it could be questionable whether this discussion satisfies the "good reasons" requirement of the treating physician rule. However, reading the ALJ decision as a whole, it is clear the ALJ thoroughly evaluated Rodarmer's hearing testimony and the medical evidence. Specifically, the ALJ discussed Rodarmer's allegations, noting Rodarmer reported difficulty with standing or sitting in one position, along with stiffness in the morning and trouble completing his daily activities. (Tr. 18.) The ALJ then noted Rodarmer had been treating with a rheumotologist since the 1990s, and established with Dr. Ignat in February 2013. (*Id.*) The ALJ discussed Dr. Ignat's treatment notes as follows:

> In February 2013, the claimant presented to Dr. Gheorge Ignat, M.D., a rheumatologist, upon relocating from Tennessee to Ohio for treatment of his condition. During his initial visit, the claimant reported that he experiences mainly lower back and neck pain and stiffness and pain in the hips. Upon physical examination, Dr. Ignat noted the claimant to be comfortable and in no acute distress, did not have joint swelling, exhibited normal muscle strength, but had some decreased range of motion in his hips and lumbar spine. Dr. Ignat's [sic] determined the claimant's treatment plan should continue with prescribed medication. During subsequent office visits, Dr. Ignat noted no significant changes in the claimant's condition or allegations of symptoms, thus, he continued to prescribe medication with generally positive results. In fact, progress notes from an office visit in January 2014 indicate that the claimant's ankylosing spondylitis improved with medication (Ex. B5F).

(*Id.*)

The ALJ then discussed and reviewed Rodarmer's chiropractor and primary care doctor treatment notes, as well as the February 2014 consultation with Dr. Yao. (Tr. 19.) In this discussion, the ALJ noted Rodarmer had reported improvement with his medications, and "he continued to be able to perform normal basis [sic] activities of daily living without any limitations. (*Id.*) The ALJ also noted Rodarmer had done well after his carpal tunnel procedures, and the "numbness and tingling in his fingers had resolved." (*Id.*)

31

The ALJ also provided an overview of Rodarmer's daily activities, acknowledging the use of a cane, but also noting Rodarmer did not use it on a daily basis. (Tr. 20.) The ALJ reported Rodarmer shops, cooks, performs light housework, and some yardwork. (*Id.*)

Had the ALJ discussed the aforementioned evidence immediately after stating he was giving "little weight" to Dr. Ignat's opinion, there would be no question the ALJ provided "good reasons" for giving it less than controlling weight. The fact the ALJ did not analyze the medical evidence for a second time when assessing Dr. Ignat's opinion does not necessitate remand of Rodarmer's case. *See e.g., Ellis v. Comm'r of Soc. Sec.*, 2015 WL 6444319 at * 15-16 (N.D. Ohio Oct. 23, 2015); *Hanft v. Comm'r of Soc. Sec.*, 2015 WL 5896058 at * 9 (N.D. Ohio Oct. 8, 2015); *Daniels v. Comm'r of Soc. Sec.*, 2014 WL 1304940 at * 4 (N.D. Ohio March 27, 2014) ("There is no magic language that an ALJ must use to show that he or she has considered the factors in 20 CFR § 404.1527. Rather, the ALJ must set forth his or her supporting reasoning, based on evidence in the record, to allow for meaningful judicial review.") "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)). *See also Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x 171, 173 (6th Cir. 2004 ) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766, n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) ).

Further, substantial evidence supports the ALJ's finding Dr. Ignat's opinion was entitled to little weight. Rodarmer established with Dr. Ignat in February 2013. (Tr. 307.) On examination, his hips were tender with decreased range of motion and he had shoulder crepitus, but normal range

of motion. (*Id.*) His cervical spine was tender, with a normal range of motion. (*Id.*) His lumbar spine was tender, with a decreased range of motion. (*Id.*) He had tenderness in his sacroiliac joints, but his muscle strength was normal. (*Id.*) A review of the other examinations by Dr. Ignat indicate similar objective findings. (Tr. 380, 376, 305, 304, 303.)

Dr. Ignat prescribed various medications to Rodarmer during the relevant period, with reported improvement in symptoms. In August 2013 and October 2013, Rodarmer indicated improvement with Simponi. (Tr. 304, 305.) In April 2015, Dr. Ignat noted "overall his condition is still active, not controlled with medications." (Tr. 376.) Rodarmer then switched medications, and began to take Otezla. (*Id.*) In July and August 2015, Dr. Ignat indicated Rodarmer's condition was "in general controlled now since he started Otezla." (Tr. 375, 372.)

Beyond Dr. Ignat's treatment notes, the diagnostic testing supports the ALJ's findings. A February 2014 x-ray of the sacroiliac joints revealed sclerosis, with probable mild ankylosis on the right side. (Tr. 337.) Pulmonary function testing at that time was normal. (Tr. 346.) August 2015 bilateral hip x-rays revealed maintained sacroiliac and hip joints. (Tr. 386.) On the left hip, there was a subcondral cystic change on the left femoral neck, and mild sclerosis of both sacroiliac joints. (Tr. 386.)

Treatment notes from other sources further support the ALJ's findings regarding Dr. Ignat's opinion. During a February 2014 consultation with Dr. Yao, Rodarmer reported 20% improvement with his medications, and indicated he could perform normal activities of daily living without limitations. (Tr. 333.) Dr. Yao noted Rodarmer did not have an unsteady gait or a cane, and no swelling in his joints. (Tr. 334.) In March 2015, Rodarmer's podiatrist, Dr. Salem, noted Rodarmer's foot pain was "very minimal." (Tr. 370.) Dr. Salem also noted pain to palpation in the

foot, but 5/5 muscle strength in his foot and ankle. (Tr. 369.)

Rodarmer argues the ALJ "did nothing more than ambiguously [reference] cherry-picked pieces of Dr. Ignat's records," and gave no consideration to the nature of the treatment relationship or the specialization of Dr. Ignat. (Doc. No. 12 at 9, 10.) The Court finds this argument without merit. It is true immediately following the ALJ's discussion of the opinion, the ALJ noted Rodarmer was often "pleasant, comfortable, and in no acute distress" during his office visits with Dr. Ignat. (Tr. 21.) However, the ALJ also acknowledged Rodarmer had "joint pain, back pain, stiffness, and some decrease[d] range of motion." (*Id*.) He also noted, earlier in the decision, that Dr. Rodarmer was a rheumatologist and Rodarmer had been regularly seeing him for treatment. (Tr. 18.)

Further, prior to the discussion of the opinion, the ALJ dedicated three pages to a detailed review of the evidence, in which the ALJ noted both the positive and negative examination findings. (Tr. 18-20.) For example, the ALJ recognized Rodarmer had "decreased range of motion in his hips and lumbar spine," but did not have "joint swelling [and] exhibited normal muscle strength." (Tr. 18.) The ALJ also provided a review of the diagnostic testing, which "revealed no evidence of spinal ankylosis at the thoracic level, but did find sclerosis of the sacroiliac joint with probable mild ankylosis on the right." (Tr. 19.) Thus, it is clear the ALJ considered all the evidence, not simply the pieces of the medical record which supported his conclusion.

Rodarmer also asserts Dr. Ignat's opinion was "remarkably consistent" with a "highly-qualified, impartial CE." (Doc. No. 12 at 11.) Upon review of the record, it appears Rodarmer is referring to the April 25, 2011 consultative examination and associated opinion, conducted by Robert A. Blaine, M.D. (Tr. 256-264.) As Rodarmer applied for disability benefits in the instant matter on October 14, 2013, this consultative examination is in connection with a prior application for

disability, and a prior Administrative Law Judge decision not currently under review by this Court. (Tr. 12, 88.)

Rodarmer cites no authority for the proposition the ALJ must make comparisons between the current evidence and a previously weighed and considered opinion connected with a prior Administrative Law Judge decision. Indeed, the Sixth Circuit has acknowledged neither *Drummond*[13] or Social Security Acquiescence Ruling 98-4p[14] "require the ALJ to make specific comparisons with the evidence supporting the prior final decision." *Rudd v. Comm'r of Soc. Sec.*, 531 Fed.App'x 719, 725 (6th Cir. 2013). Further, this consultative examination was conducted *over two years* prior to Rodarmer's alleged onset date of disability. The probative value of a remote examination was likely minimal, as the objective findings were not made during the unadjudicated period before the ALJ.

Accordingly, and for the reasons set forth above, the Court finds the ALJ properly evaluated Dr. Ignat's opinion and provided a "good reason" for affording it little weight. Rodarmer's second assignment of error is without merit.

---

[13]    In *Drummond* , the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 at 842 (6th Cir. 1997).

[14]    In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98–4(6), which adopted the holding of *Drummond. See* AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998).

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/*Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 18, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**